# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# ABERDEEN DIVISION

JAMES EVERETT DUTSCHKE                                              MOVANT

V.                                                          NO. 1:13CR81-SA

UNITED STATES OF AMERICA                                        RESPONDENT

## MEMORANDUM OPINION AND ORDER

Movant, James Everett Dutschke, proceeding *pro se*, filed a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. The government submitted a response to Dutschke's motion, and Dutschke replied thereto. Having considered the pleadings and the record, including the relevant parts of Dutschke's underlying criminal case, along with the relevant law, the Court finds that an evidentiary hearing is unnecessary[1], and that the instant motion will be dismissed.

### Background Facts and Relevant History

On April 27, 2013, James Everett Dutschke was arrested and charged, *inter alia*, with knowingly possessing ricin for use as a weapon in violation of 18 U.S.C. § 175(a). He was accused of mailing threatening letters containing ricin to the President of the United States, a United States Senator, and a Mississippi judge. Days prior to his arrest, while Dutschke was under surveillance, personnel from the FBI and the Mississippi Office of Homeland Security

---

[1] An evidentiary hearing is required on a § 2255 motion unless the motion, files, and record conclusively show that the prisoner is not entitled to relief. *See* 28 U.S.C. § 2255(b); *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992). It is the prisoner's ultimate burden, however, to sustain his claims by a preponderance of the evidence. *United States v. Bondurant*, 689 F.2d 1246, 1251 (5th Cir. 1982). Accordingly, if there is no "independent indicia of the likely merit" of the allegations made in the motion, a hearing is not required. *United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006) (citation omitted).

witnessed Dutschke discard several items into a public garbage disposal. Among those items were a coffee grinder, a box of latex gloves, and a dusk mask. Bioforensic testing on the mask revealed the presence of Dutschke's DNA and the presence of ricin.[2] A grand jury returned an indictment against Dutschke charging him with mailing threatening communications to the above referenced individuals and attempting to frame another individual for his crimes.

Following his arrest, Dutschke was housed at the Lafayette County Detention Center where he, with the assistance of another inmate, attempted to have ricin manufactured and mailed to at least one of the same intended victims of the previous ricin mailings. Unbeknownst to Dutschke, this inmate was cooperating with the FBI. On or about June 20, 2013, Dutschke spoke to the inmate's girlfriend via telephone, attempting to obtain her assistance in acquiring the materials to make ricin and her cooperation in mailing letters containing ricin. During the call, which was recorded by the girlfriend and the Lafayette County Detention Center, Dutschke told the girlfriend that he would mail her two letters — one containing the ricin recipe and one containing the template for the threatening letters. The letters were intercepted, and FBI experts opined that the recipe was valid and would produce a substance containing ricin. A superseding indictment was returned to incorporate this attempted scheme into the charges against Dutschke.

Because of this and other schemes orchestrated by Dutschke, it was eventually determined that there was a substantial risk that Dutschke's contact or communications could result in death or serious bodily injury to persons. Therefore, pursuant to 28 C.F.R. § 501.3, Special Administrative Measures ("SAMs") were requested and were authorized by the United

---

[2]Additional items were seized as the result of searches of Dutschke's residence and former place of business.

States Attorney General and implemented on October 10, 2013, to restrict Dutschke's access to mail, media, telephone, and visitors.

Dutschke pleaded guilty to the first four counts of the superseding indictment on January 17, 2014. In a binding agreement, the parties agreed that Dutschke's 300 month federal sentence would run concurrently with Dutschke's multiple state court convictions for fondling. His federal plea agreement contained the following waiver of appellate rights:

> WAIVER OF ALL APPEALS AND COLLATERAL ATTACKS:
> Defendant hereby expressly waives any and all rights to appeal the conviction and/or sentence imposed in this case, and the manner in which sentence was imposed, on any ground whatsoever, including but not limited to the grounds set forth in 18 U.S.C. § 3742. Defendant also hereby expressly waives all rights to contest or collaterally attack the conviction and/or sentence, and the manner in which the sentence was imposed, in any post-conviction proceeding, including but not limited to a motion brought pursuant to 28 U.S.C. § 2255, excepting only any grounds or allegations of ineffective assistance of counsel. Defendant waives these rights in exchange for the concessions and recommendations made by the United States in this plea agreement.

Plea Agreement, p.2 ¶ 4.

Before Dutschke entered his plea, the Government read the factual basis for the agreement. The factual basis noted that there was evidence of ricin production at Dutschke's former business, that his computer contained evidence of research on ricin production, and that the letters and address labels that were sent to the President, a Mississippi Senator, and local judge were printed on the printer that had come from Dutschke's house.

During his initial sentencing hearing on May 13, 2014, Dutschke read part of a thirty-seven page statement, in which he told the Court that he had only made fertilizer, and that no ricin was found on any items seized from him and tested by the government scientists. Because of Dutschke's statements, the Court recessed the hearing to allow Dutschke an opportunity to

consult with his attorney regarding whether to move to withdraw the plea agreement. When Court reconvened, Dutschke stated that he intended to move to withdraw his guilty pleas.

Ultimately, however, Dutschke did not move to withdraw his pleas and elected to go forward with sentencing. On May 19, 2014, he received, under the provisions of the plea agreement, a sentence of twenty-five years to be served in federal custody, with the sentence to run concurrently with his state court fondling convictions. At the hearing, Dutschke iterated his guilt and his understanding of his guilty pleas, including his understanding that he was giving up his right to challenge the conviction and sentence.

## Legal Standard

After a defendant has been convicted and exhausted his appeal rights, a court may presume that "he stands fairly and finally convicted." *United States v. Frady*, 456 U.S. 152, 164 (1982). A motion brought pursuant to § 2255 is a "means of collateral attack on a federal sentence." *Cox v. Warden, Federal Detention Ctr.*, 911 F.2d 1111, 1113 (5th Cir. 1990) (citation omitted). There are four separate grounds upon which a federal prisoner may move to vacate, set aside, or correct a sentence under § 2255: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum sentence; or (4) the sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255. Collateral attack limits a defendant's allegations to those of "constitutional or jurisdictional magnitude." *United States v. Samuels*, 59 F.3d 526, 528 (5th Cir. 1995) (citation omitted). Relief under § 2255 is reserved, therefore, for violations of "constitutional rights and for that narrow compass of other injury that could not have been raised on direct appeal and, would, if condoned, result in a complete miscarriage of

justice." *United States v. Capua*, 656 F.2d 1033, 1037 (5th Cir. 1981).

## Discussion

Dutschke claims that he was wrongfully convicted under 18 U.S.C. § 175, raising five points of error: (1) In charging him, the Government misalleged a material element of the offense, as ricin is a chemical, rather than a biological, weapon; (2) He is actually innocent of the charged statute; (3) The Court has no jurisdiction for his actual conduct, as the statute does not allow for the prosecution of a nontoxic substance; (4) He received the ineffective assistance of counsel; and (5) The statute itself is unconstitutional. While he acknowledges that he signed a waiver of his constitutional rights when he entered a plea, Dutschke nonetheless argues that the Court may review his claims because the Government breached the plea agreement multiple times, thereby releasing him from the appeal waiver provision.

It is settled that as long as a waiver is knowing and voluntary, a defendant may waive his statutory right to appeal and seek post-conviction relief as part of a plea agreement. *See, e.g., United States v. Wilkes*, 20 F.3d 651, 653 (5th Cir. 1994). *United States v. Melancon*, 972 F.2d 566, 567 (5th Cir. 1992); *see also Town of Newton v. Rumery*, 480 U.S. 386, 393 (1987) (finding that a defendant may waive constitutional rights as part of a plea agreement). To be knowing and voluntary, the defendant must know that he had a right to appeal and was giving up that right. *United States v. Portillo*, 18 F.3d 290, 292 (5th Cir. 1994). Where a defendant indicates he has read the plea agreement and understands it, and it contains "an explicit, unambiguous waiver of appeal, the waiver was both knowing and voluntary." *United States v. McKinney*, 406 F.3d 744, 746 (5th Cir. 2005).

At Dutschke's change of plea hearing, Dutschke stated he was satisfied with his

5

attorney's representation. Change of Plea Tr. at 5-6. Defense counsel was asked whether he reviewed the plea agreement with the defendant, and counsel responded affirmatively. *Id.* at 13, 18. The Court ascertained that Dutschke understood the agreement and specifically inquired into whether he realized that he was agreeing to waive his rights to appeal and to collaterally attack his sentence by accepting the plea. *Id.* at 16. Dutschke replied, "Unfortunately, I do, ma'am." *Id.* After the factual basis was read into the record, and Dutschke had an opportunity to bring the Court's attention to particulars with which he disagreed, he stated: "I'm voluntarily entering this plea. And I understand fully that in doing so I am accepting responsibility for - - for everything that [the prosecutor] mentioned." *Id.* at 34-35. Accordingly, the evidence shows that Dutschke signed an unambiguous waiver of his statutory rights to appeal or seek post-conviction relief and confirmed in open court that he understood the provisions of the agreement and the rights he was waiving.

There is an exception to the rule that a waiver bars post-conviction relief: the ineffective assistance of counsel. However, the Fifth Circuit has held that an ineffective assistance of counsel claim survives a defendant's § 2255 waiver "only when the claimed assistance directly affected the validity of that waiver or the plea itself." *United States v. White*, 307 F.3d 336, 343 (5th Cir. 2002). In order to succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel rendered deficient performance that prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Whether counsel's performance was deficient requires consideration of whether counsel's performance was objectively reasonable under prevailing professional norms. *Day v. Quarterman,* 566 F.3d 527, 536 (5th Cir. 2009). In evaluating counsel's performance, courts presume that counsel rendered reasonable professional judgment.

*See id.*; *Strickland*, 466 U.S. at 689; *see also Bell v. Cone*, 535 U.S. 685, 701 (2002). Prejudice is established if a defendant can show that the outcome of his proceedings would have been different but for counsel's alleged errors, and that "the result of the proceedings was fundamentally unfair or unreliable." *Vuong v. Scott*, 62 F.3d 673, 685 (5th Cir. 1995) (quotation omitted). Specifically, with regard to a guilty plea, a defendant establishes prejudice flowing from the ineffective assistance of counsel by showing "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *United States v. Glinsey*, 209 F.3d 386, 392 (5th Cir. 2000) (quotation omitted).

Here, Dutschke claims that counsel rendered ineffective assistance by failing to determine that ricin is a chemical weapon subject to prosecution under 18 U.S.C. § 229, not a biological one subject to prosecution under § 175, and in failing to dismiss the indictment against Dutschke when it was revealed that there was no ricin toxin discovered in the seized evidence. He claims that counsel should have moved to sever the issues of mailing the letters from the making of the ricin. He also maintains that counsel performed ineffectively in failing to research statutory law and discover the "trace impurities exemption" applicable to ricin. Affording Dutschke's complaints very liberal construction, the Court addresses these complaints as challenges affecting the plea process itself.

According to the Centers for Disease Control and Prevention, "[r]icin is a poison found naturally in castor beans. If castor beans are chewed and swallowed, the released ricin can cause injury. Ricin can be made from the waste material left over from processing castor beans." http://emergency.cdc.gov/agent/ricin/facts.asp (last visited September 30, 2015). Numerous courts have accepted the view that ricin possession may be prosecuted as a biological weapon

7

under 18 U.S.C. § 175. *See, e.g., United States v. Crump*, 609 F. App'x 621 (11th Cir. July 6, 2015) (rejecting vagueness challenge to prosecution of possession of castor beans under 18 U.S.C. § 175); *United States v. Olsen*, 704 F.3d 1172 (9th Cir. 2013) (affirming defendant's conviction of ricin possession under 18 U.S.C. § 175); *United States v. Hughes*, 273 F. App'x 587, 2007 WL 4553331 (9th Cir. December 26, 2007) (finding evidence supported conviction under 18 U.S.C. § 175 for attempted production of biological toxin where defendant food dehydrator tested positive for castor bean DNA); *United States v. Baker*, 98 F.3d 330 (8th Cir. 1996) (affirming conviction under § 175 for ricin possession notwithstanding defendant's statements that he intended to use it to kill garden pests). Therefore, counsel did not perform ineffectively in failing to attempt to prevent Dutschke's prosecution under 18 U.S.C. § 175.

The Court also determines that, as evidenced by the recitation of facts presented above, the issues surrounding the mailing of the letters and the making of ricin are intertwined.[3] Therefore, a multi-count indictment was proper under the facts of this case. *See* Rule 8(a) of Federal Rules of Criminal Procedure ("The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged. . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."). Dutschke has not demonstrated that a motion to sever would have been successful under the facts of this case, and the failure to raise a meritless argument can never constitute ineffective assistance. *See, e.g., United States v. Kimler*, 167 F.3d 889, 893 (5th

---

[3] For example, evidence of Dutschke's ricin production was found at his former place of business and on items retrieved from that location; the letters to the victims and the affixed labels were printed on his computer, which contained evidence of ricin production; his DNA was on a mask that also contained ricin traces; and he was audiotaped attempting to have ricin produced using his "recipe" and mailed to a previous target.

Cir. 1999) ("An attorney's failure to raise a meritless argument thus cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.").

Dutschke's remaining arguments regarding counsel's performance relate to the toxicity of the ricin for which he was prosecuted. The Court first notes that Dutschke's counsel moved for, and was granted, the assistance of expert toxicologists who were consulted in this case. *See* ECF Nos. 54 and 55 (under seal). Before Dutschke entered his plea, trial counsel made the following record regarding the toxicity of the ricin for which Dutschke was charged:

> Mr. Coghlan: Your Honor, before you accept his plea, may I make a brief record about some additional facts that Mr. Dutschke's aware of; so that the record will be clear in the event there's some postconviction proceeding where it may be unclear about what he did?
> The Court: Okay. But there won't be -- if the Court accepts the plea --
> Mr. Coghlan: There has been one claim that has been reserved that he has not waived.
> The Court: Thank you. You may proceed.
> Mr. Coghlan: Your Honor, the base offense level, before enhancements, under the guidelines in this case, range from a level 42 down to a level 20. That's before enhancements. The guidelines provide that if a defendant threatened to spread the -- the commentary talks about anthrax. But if a defendant threatens to spread a poison and, in fact, spreads a powdery substance but the powdery substance is harmless, it's a much reduced guideline level than a level 42. The defendant has been made aware that defense experts have reviewed the Government's discovery; and using the Government's results and the Government's testing at face value, that in one sample the amount of ricin was 75 micrograms, which is 75 one-millionths of one gram of ricin, which would not be visible to the naked eye. The second substance tested, using the Government's own numbers, contained 91 micrograms of ricin or 91 one-millionths of one gram of ricin. So I want the record to be clear that the defendant knows that; that he knows that experts, defense experts, have look at it; that defense experts very well may have been prepared to testify that the substance was harmless. But if the proof that the Government lays out contradicted the defense proof, he could be looking at life in prison; or he could be looking at something much less than 25 years if the defense proof bore out to be the facts. He is accepting this plea realizing that there are consequences either way, and he is satisfied that this is a compromise that he is willing to enter into and is entering into voluntarily. And he knows all these facts

> now, so that there's no question later on that he did not know those facts when he entered this plea.
> The Court: Did you understand everything Mr. Coughlan just stated?
> Dutschke: Yes, ma'am.

Plea Tr., pp. 36-37.

At Dutschke's first attempted sentencing, held on May 13, 2014, counsel argued the ricin's toxicity in an objection to the calculation of Dutschke's base offense level. Counsel stated:

> Mr. Coghlan: Your Honor, on the first question of whether the substance was capable of producing any injury, death, or serious bodily injury, two points. One is, in this particular case, part of the government's proof was that the defendant allegedly sent his recipe for making ricin to another individual, which the government intercepted and was able to analyze. The government agents in this case looked at the -- I'm going to call it the recipe, and attached to my objections, the conclusion by the government scientist was -- it says "Additionally, if the recipe were followed as described, the final solid product would likely contain detectable levels of ricin, but be impure and of questionable toxicity." Second, Your Honor, the two samples that the government obtained from the senator's office and, I believe, the judge's office, one contained .6987 grams of a granular substance which the government maintains had a ricin purity level of .013 percent, which would be .00013, I guess, but in any event, that's 91 on millionths of 1 gram. The second sample contained .015 grams of a granular substance with a ricin purity level of .05 percent, which would be 75 one millionths of 1 gram of ricin. The first sample would be 91 one millionths of 1 gram of ricin. You combine the microscopic levels of ricin with the impurity that the government report noted, I think the defendant has demonstrated that the substance was either harmless or not -- that there's not enough proof that it was harmful. But as Your Honor accurately pointed out, if the defendant thought that the substance was harmful, he does not get the benefit of a level 20. The probation service noted in their -- in the response to my objections that there was a seizure of a mask and maybe some gloves, which probation service felt showed at least circumstantial evidence that the defendant must have thought that the substance could be harmful. Otherwise, why would he use a mask and gloves? Your Honor, I don't -- that's certainly good argument, but people use masks and gloves for a lot of things, not necessarily because they think it would be capable of death. So, Your Honor, for those reasons, we feel like that a base offense level of 20 would be appropriate.

10

May 13 Proceedings, pp. 14-15.[4]

Later in the sentencing hearing, the following exchange took place between Dutschke and the Court in which Dutschke made a lengthy argument as to ricin classification and toxicity:

> Dutschke: I think I am, but there's -- it's really essential that everybody understand that there's a huge difference between ricin toxin and ricin proteins. There were no -- there was no ricin toxin anywhere in my castor fertilizer.
> The Court: Uh-huh.
> Dutschke: The way to make castor fertilizer -- and anybody in here can easily look this up -- is to simply do exactly what I did. The precautions were taken to make sure that something that could have once been toxic was not toxic, was made un-toxic. It's called denaturing proteins, and you do it every day when you boil or cook an egg. You denature proteins. When that is done with castor products, there is no ricin toxin. It's simply scientifically impossible. And he's counting on people not knowing the difference, Your Honor.
> From now on, anytime anybody says the word *ricin*, I would hope that they are immediately demanded for clarification. Do you mean ricin toxin or ricin proteins? If they say ricin toxin based on these tests, they're lying to you, because it's not possible.
> The Court: Well, let's address that objection and your concerns.
> Dutschke: Please, because --
> The Court: And I do understand you --
> Dutschke: -- because it's the biggest of the concerns.
> The Court: I do understand your argument.
> Dutschke: Yes, ma'am.
> The Court: Let me tell you again why it is that I believe it does not apply. Had we had a trial in this case, it would have been interesting. It would have been a long trial. A countless number of experts would have testified, and I don't doubt that experts for the government as well as for the defense would have explained over the course of weeks the very kinds of things that you are describing to me. In many of our pre-plea sessions, it was clear to the Court that this was complex, that I -- that -- it would have involved, a necessity, experts coming to testify to a jury about these very kinds of issues that you're bringing up. But there was a plea, and you pled to these four counts. Now, when I address these objections, I address them as they relate to the sentencing guidelines for sentencing purposes. For sentencing purposes, I am looking at whether or not offense level 20 applies or offense level 28 applies. And it's the Court's finding -- though you may disagree with it, it is the Court's finding that what makes the difference between

---

[4] The Court found that the toxicity of the ricin is not of consequence to the base offense level enhancement, as the intent, rather than the toxicity, determined the correct offense level. May 13 Proceedings, pp. 20-21.

>level 20 and 28 is intent.
>Dutschke: Okay.
>The Court: You had the intent to develop this chemical weapon. You did develop it. It's undisputed that you developed a chemical that is and was ricin. We can argue about whether it was granular or whether it could be inhaled, what purity it was. We could argue those things, but they're immaterial for purposes of guideline sentencing, because it's your intent to manufacture, regardless of toxicity, and your intent to send those letters that drives that determination, and that's the Court's ruling.

May 13 Proceedings, pp. 38-40.

The evidence recited above establishes that Dutschke's attorney was aware of the non-toxicity issue and made objections based on purity of the ricin seized in this case.[5] Dutschke was allowed an opportunity to determine whether to move to withdraw his plea, and he elected to go forward with sentencing with knowledge of the Government's evidence. At his sentencing, the Court took care to ensure that Dutschke reaffirmed his guilty pleas and agreed to be bound by the terms of the plea agreement. Dutschke entered into an unambiguous plea agreement containing an express waiver of his right to appeal or seek collateral review. Based on all of the evidence before it, the Court concludes that Dutschke's waiver was informed and voluntary, and his counsel did not render ineffective assistance.

The Court notes, however, that if the Government breached the plea agreement, "the

---

[5] The Court otherwise notes with approval the Government's argument that there is no trace impurities exemption under § 175. "Petitioner also argues for use of the "Round to Zero Rule" found in 15 C.F.R. § 712(1), which does not apply in this case. Under the plain meaning rule the title of the statute can be used to clarify a section. The title "Round to zero rule that applies to activities involving Schedule 1 chemicals" plainly refers to Schedule 1 chemicals which are used in conjunction with § 229, the Chemical Weapon Convention statute. Under the § 229 list, Ricin is a Schedule 1 chemical, but in the "Select Agent and Toxins list" applicable to § 175 "[t]he select agents and toxins marked with an asterisk (*) are designated as Tier 1 select agents and toxins…" Under 42 C.F.R. § 73(3)(b), Ricin is not marked with an asterisk. This is because Ricin is a Tier 2 Toxin, and because Ricin is not a Tier 1 toxin which could be considered parallel to the classification of Schedule 1 chemicals § 229 then the "round to zero" arguably considered a "trace exception" does not apply to Ricin." Response, p. 17.

12

defendant is necessarily released from an appeal waiver provision contained therein." *United States v. Gonzalez*, 309 F.3d 882, 886 (5th Cir. 2002). Dutschke argues that such is the case here, maintaining that the Government breached its promise not to prosecute him further and not to place him in a "Supermax" facility. First, the Court notes that it knows of no evidence in the record as to any promise made to the defendant about his placement. There is no testimony, no comments made on the record, and nothing in the plea agreement that speaks to the existence of an understanding as to Dutschke's housing once he pleaded guilty. His assertions are uncorroborated and fail to persuade the Court that he is entitled to release from the plea's wavier provision. *See, e.g., Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) (establishing a court cannot consider bald assertions, unsupported by anything in the record, to be of probative evidentiary value). Dutschke's plea agreement states, in relevant part, that "[t]he United States agrees not to charge the defendant with other offenses arising from or related to the [guilty plea] charges." Plea Agreement, p. 2 ¶ 2. The agreement further states that "[t]his agreement does not bind any prosecuting authority of any state or any other federal district. . . . Nor does this agreement bind the United States or any of its departments or agencies with regard to any civil or administrative actions or remedies." *Id*. at ¶ 3. Dutschke has not faced additional prosecution in violation of the plea agreement. Insofar as Dutschke challenges his housing and/or the imposition of SAMs during his incarceration, such complaints address the conditions of his confinement and are not "further prosecutions." Accordingly, the Court concludes that Dutschke has not shown that the Government has breached the plea agreement.

**Conclusion**

Dutschke produced a biological toxin and mailed threatening communications containing the toxin to the President of the United States, a United States Senator, and a Mississippi Judge. He waived his right to appeal and seek post-conviction relief only after the Court was fully convinced that he understood his waiver and wished to proceed with the plea. While Dutschke could have been sentenced to life in prison if found guilty of his crimes, his attorney successfully secured for him a twenty-five year federal sentence to run concurrently to Dutschke's sentence on state fondling charges. There is no merit to Dutschke's complaints. Thus, the Court **ORDERS** that Dutschke's § 2255 motion be **DISMISSED WITH PREJUDICE**. A separate final judgment will enter today.

**THIS** the 19th day of October, 2015.

/s/ Sharion Aycock
**U.S. DISTRICT JUDGE**